02-11-072-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO.  02-11-00072-CV

 

 


 
 
 In the Interest of A.C.H. and C.L.W., Children
 
 
  
 
 
  
 
 
 
 
  
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

 

----------

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I. 
Introduction

          Appellants
E.S.W. (Father) and T.H. (Mother) appeal the trial court’s judgment terminating
their parental rights to their two children, A.C.H. and C.L.W.  In two issues, Father
challenges the sufficiency of the evidence supporting the trial court’s
endangerment and best interest findings.  In three issues, Mother challenges
the sufficiency of the evidence supporting the trial court’s best interest
finding, contends that the trial court violated her due process rights by
failing to release her from a bench warrant, and argues that the trial court
abused its discretion by denying her motions for continuance.  We affirm.

II. 
Background

A. 
Trial Evidence

          Michelle
Gilley

          Michelle
Gilley is a Department investigator.  She testified that the Department
received a negligent supervision referral in September 2009 relating to drug
use in Mother’s and Father’s home.  Gilley interviewed Mother, B.W. (Mother’s
grandfather), and the children at B.W.’s home in late September, and Mother and
B.W. expressed great willingness to cooperate with the Department.  Mother also
told Gilley, however, that Father was incarcerated at the time for violating
his probation.  Mother said that she had lived on Prelude Drive before moving
into B.W.’s home with the children, that others living in the Prelude Drive
house had drug paraphernalia in the home, and that they had used marijuana. 
Mother later told Gilley that others living in the house had been selling
methamphetamines.  Mother denied having used drugs and voluntarily submitted to
an oral swab drug test.  Gilley also observed the children at the visit, and
she testified that she did not have any concerns about the children at the
time.

          Gilley
met with Father at his residence on Prelude Drive on December 14, 2009, but only
after Father missed several previously-scheduled appointments.  Father admitted
smoking marijuana but denied using other drugs.  He also told Gilley that he
was not employed, that he was on probation, and that he was subject to random
drug tests.  Father also specifically denied any history of domestic violence.

          The
day after meeting with Father, Gilley received another referral involving
Mother and Father for an incident that had occurred on December 11, 2009.  A
witness had called the police after seeing an altercation between Mother and
Father in the street and noticing that both children were present.  Mother
later told Gilley that she and Father had argued about money and that Father
kicked her in the side, pulled her hair, forced her out of the vehicle, put her
onto the ground, and kicked her several more times.

          B.W.
called Gilley in January 2010 and told her that Mother had moved to Kansas City
with the children.  Mother called Gilley later in January, but instead of
offering cooperation, Mother cursed and yelled at her.  Gilley located Mother
at the Prelude Drive house on February 1, and met with her in person at B.W.’s
house the next day.  Mother denied living at the Prelude Drive house, said that
she was there only to retrieve her things, and told Gilley that she had mostly
lived with B.W. at his house since December.  However, Mother told Gilley that
she was not employed, that she had used methamphetamine the previous night, and
that she had smoked marijuana four or five days earlier.  Mother also admitted
having a bad methamphetamine habit and said that Father was “on
[methamphetamine] bad.”  Mother denied doing drugs with Father, however, and
said that Father had kept the children during the times that she was using
drugs. Gilley agreed that neither parent had admitted to using drugs with the
children present.

          Gilley
testified that she then began looking at placement options, but none of the
three family members proposed by Mother was acceptable.  The children’s
paternal grandfather had a criminal history, the maternal aunt had a history
with the Department, and B.W. had recently provided misleading information to
Gilley when she was trying to locate Mother.  Thus, Gilley requested removal,
and the children were placed into foster care.[2]

          At
the time of removal, the children were two and three years’ old, respectively,
and they had speech delays, lice, and needed dental work because of brown
decay-spots on their teeth.  Gilley testified that the children nevertheless
seemed happy and that they interacted well with the foster parents.  Both
children did, however, ask for their parents.

          Gilley
spoke with Father on February 9, 2010.  Father told her that his probation
officer had referred him for a drug assessment.  Gilley spoke with Mother on
February 22, and Mother told her about a recent domestic violence incident
involving Father.  Mother had declined to give Father money and a ride, and
Father had responded by trying to pull Mother out of her truck.  Father also
grabbed a can of gasoline from the back of the truck and poured gasoline all
over Mother and the truck.  Father then held a lighter toward Mother and
threatened to start a fire.  Father admitted pouring gasoline on Mother’s
truck, but he denied pouring gasoline on Mother or threatening to start a
fire.  Father also admitted that he threw a brick at Mother on a separate
occasion and that the brick hit Mother in her side, but Father said he did so
because she was trying to run into him with her truck.

          Gilley
testified that she again met with Father following his visit with the children
at the Department offices on February 26.  Father admitted arguing with Mother
during the December 11 incident, but he denied any physical confrontation. 
Father also admitted using marijuana and “a little bit of ice” within the
previous week, but he told Gilley that he would be interested in drug
treatment.

          Gilley
testified that she reviewed Mother’s and Father’s criminal histories as part of
her investigation.  Mother did not yet have a criminal record, but Father did. 
Between 1999 and 2010, Father had pleaded guilty to criminal mischief,
possession of marijuana, assault causing bodily injury, and three instances of
theft.  Father had also pleaded nolo contendere in 2002 to evading arrest or
detention. 

          On
cross-examination, Gilley testified that she found the children to be
appropriately cared for and healthy at the time of the initial referral in
September 2009 and that the initial referral was closed as “ruled out.”  She
also testified that the children were bonded to their mother, that the children
appeared to have an appropriate relationship with Mother, and that the children
seemed happy and clean.  Gilley also agreed that she did not find anything that
involved physical harm to either child in her investigation of the September
and December 2009 referrals.

          Brandi
Gaut

          Brandi
Gaut works for Johnson County and is Mother’s probation officer.  In July 2010,
Mother was placed on five years’ probation for possession of less than one gram
of a controlled substance.[3]  The offense date was
April 28, 2010.  Gaut met with Mother in July 2010 and learned that Mother was
pregnant, was living with a friend who was also on probation, and was planning
to move in with B.W.  Mother also informed Gaut of this case but asked Gaut not
to tell the Department caseworker about her probation.

          Mother
also submitted to drug tests during her probation.  Mother admitted using
methamphetamines and marijuana on July 7, 2010, and using marijuana on August
10 and 15, 2010.  Because of the continued drug use, Gaut offered Mother the
opportunity to voluntarily participate in the “H.O.P.E. In Jail” drug
rehabilitation program, but Mother declined because she was pregnant and had
other obligations, which Gaut testified included her other children.  Thus,
Gaut contacted the district attorney’s office, a warrant was issued, and Mother
was arrested.  Mother’s probation was not revoked, but the court ordered her
into the H.O.P.E. In Jail program for 120 days.

          Gaut
met with Mother twice during her incarceration.  During the first visit, Mother
was very agitated and vehemently objected to being told not to have any further
contact with Father.[4]  Mother’s demeanor was
much better during the second jail visit, and Gaut testified that Mother was in
compliance with the terms of her probation at the time of the second visit.

          Rebecca
Collins

          Rebecca
Collins was Mother and Father’s caseworker from February through September
2010.  Collins met with Mother and Father at the show cause hearing and
discussed the services they would need to complete.  Mother expressed interest
in drug counseling and seemed eager to work her services. Father also expressed
interest in working services and said that he would soon begin drug
rehabilitation, that he was subject to random drug testing, and that he was
attending Narcotics Anonymous meetings.  Father also expressed interest in anger
management classes.

          Collins
testified, however, that neither Mother nor Father followed up with their drug
assessment referrals and that she had to get new referrals for each parent in
May or June 2010.  Collins also testified that although she was encouraging
Mother and Father to begin their services, they had not started by May 2010.  They
had made a few appointments, but they did not attend.  Mother missed her
psychological evaluation appointment in May 2010, both Mother and Father missed
their individual counseling appointments in March 2010, and neither parent
reported that they had found stable housing or employment.  Father submitted to
a drug assessment in May 2010, but he was incarcerated shortly thereafter and
had not worked toward the completion of his other services before going to
jail.

          Mother
had not worked any of her services as of June 2010.  Mother did attempt to have
a drug assessment done in early June, but she was not able to do so because the
referral had expired.  Also in June, Mother reported to Collins that she was
pregnant and that Father was the father of the child.  Mother and Father had
reported to Collins that they were not together anymore, but Collins did not
believe them because there were instances of domestic abuse after the children
were removed[5] and witnesses had
reported having seen Mother and Father in the same car together.

          Collins
also discussed Mother’s ongoing drug use with her in June 2010.  Mother
submitted to a drug test in June, but she never completed a drug assessment, a
psychological evaluation, or individual counseling.  Collins testified that
Mother had not worked any of her services before she went to jail in August
2010.  However, Collins acknowledged that it is not uncommon for parents to
wait six months before starting on their services.

          Mother
and Father had visitations with the children after removal, but the visitations
were separate because of the domestic violence allegations.  Father attended
all but one or two of the weekly visitations before his incarceration, and
Mother attended all but one of her weekly visitations before going to jail. 
Collins testified that Mother’s and Father’s interactions with the children
were appropriate during the visitations, and they brought the children food and
other things to do together during the visits.  Collins observed most, if not
all, of the visitations, and nothing concerned her about the visitations.  She
agreed that Mother and Father were very bonded with the children.

          Collins
testified that there were some concerns with the children shortly after they
were placed in foster care.  A.C.H. was behind developmentally, had shown signs
of depression, and began attending occupational therapy and speech therapy. 
C.L.W. had ear infections and had tubes placed in his ears, and both children
had cavities in their teeth.  After a time in foster care, A.C.H.’s speech,
fine motor skills, and behavior had improved.

          Collins
left the Department in September 2010.  As of that time, the permanency plan
for the children had changed from reunification to termination and adoption
because the parents had both been incarcerated, and neither had completed their
services.

          Nicoshia
Jones

          Nicoshia
Jones testified that she assumed responsibilities in this case as the
Department caseworker when Collins left in September 2010.  Jones learned
during the case that Mother was incarcerated in Johnson County and that she was
involved in and had completed the H.O.P.E. In Jail program.  Despite Mother’s
completion of that drug program, Jones testified that she believed termination
of Mother’s and Father’s parental rights to be in the children’s best interest
because Mother and Father cannot provide the stability the children need. 
Jones also testified that, in her opinion, the Department had made reasonable
efforts to work with Mother and Father before their incarcerations and that
parents are at fault if they engage in conduct that leads to incarceration.

          Jones
testified that she visited with the children monthly, but she admitted that she
had not had any personal contact with Mother or Father because they had been in
jail.  Jones further admitted to having little personal knowledge about the
parents, their interactions with the children, or their bonds with the
children, and she said that Mother and Father had each written letters to the
children from jail.  But Jones testified that Mother’s release from the Johnson
County jail during the trial did not affect her opinion concerning termination
of parental rights because Mother still had “a ways to go” with the services
she did not work before going to jail.

          Cogney
Overstreet

          Cogney
Overstreet testified that she witnessed the December 2009 incident between
Mother and Father.  Overstreet testified that she saw Mother and Father arguing
and that they had left their truck in the middle of the street.  Mother asked
Overstreet to watch the children, and Mother followed Father to continue the
argument.  Overstreet took the children inside her home, and she also talked
with the police when they arrived.  Overstreet denied seeing a physical
altercation between Mother and Father, and she denied telling the police that
Mother and Father had a physical altercation.  She also denied that the
children were outside the truck, testifying that she personally removed the
children from the truck before taking them inside her home.

          Overstreet
testified that she lives across the street from Father and that she had
observed him with the children on many occasions.  She testified that she
believed Father was a “really good dad,” that he was “always very attentive to
the kids,” and that he “just seemed like any other dad with his children.” 
Overstreet also testified that Mother is a good and loving mom and that she and
the children seemed to have a good relationship.  However, Overstreet
acknowledged that good parents do not use methamphetamines, engage in domestic
violence in front of their children, or engage in criminal activities that
result in incarceration.

          Foster
Mother

          M.E.S.
testified that she is the children’s foster mother and that the children had
been in her home since February 2010.  She testified that she noticed that the
children’s general appearance was not healthy when they first arrived.  They
had splotchy coloring on their skin, lice, and significant dental issues, and
the children appeared to have not been eating enough nutritional foods.  M.E.S.
testified that the children showed “very big improvement” after they received
vitamins and started eating healthier foods; their coloring improved, and they
had more energy.

          M.E.S.
agreed that A.C.H. was bonded with his family and that he would ask for
Father.  Father’s visitations with the children stopped before Mother’s, and
A.C.H. would inquire about his father and why he was not at the visitations.  At
about this same time, A.C.H. returned to M.E.S.’s home after a visitation with
Mother, and he tore a picture of Mother into little pieces.  A.C.H. also
sometimes had meltdowns in public when he realized he was not with Mother and
Father, and he had difficulty adjusting after visitations with them.  M.E.S.
also testified that Mother seemed appropriately concerned for C.L.W. when
C.L.W. had tubes placed in his ears and that she had attended the doctor’s
appointment.

          M.E.S.
testified that she had a lot of developmental concerns about A.C.H. when he
first arrived in her home.  He was difficult to understand when he spoke, and
he did not always understand what others told him and would instead repeat back
any instruction without taking action.  A.C.H.’s speech difficulties started to
improve with therapy, however.  His ability to articulate is still poor, but he
is able to understand others much better than before.

          A.C.H.
also required occupational therapy.  Although he was more than three years’ old
when he entered foster care, A.C.H. could not hold a fork or pick up a crayon. 
After therapy, A.C.H. learned to do these things and to dress himself.  A.C.H.
also needed play therapy to work through symptoms of depression.  M.E.S.
testified that A.C.H. improved after play therapy, and she further testified
that his “social skills started developing a lot more in August [2010] when he
had no more visits with his biological parents.”  She also testified that
neither child asked for their parents or B.W. after the parental visitations
stopped and that both children improved once the visitations stopped.

          M.E.S.
testified that C.L.W. seemed on track with his speech and occupational
development.  She further testified that C.L.W. needs a lot of attention due to
his age and that he seeks negative attention by getting into trouble.

          M.E.S.
testified that she does not intend to adopt the children but that they may
remain in her home as long as necessary for the Department to find an adoptive
family.  She also testified that there is nothing about the children that will
hinder adoption.  M.E.S. testified that she believes it is in the children’s
best interest to remain in a stable, structured environment and that she is
concerned that the children would otherwise regress.

          Jeff
Flowers

          Jeff
Flowers is the children’s child advocate volunteer.  He testified that his
observations of A.C.H.’s developmental delays are consistent with those of
M.E.S.  Flowers believes that A.C.H. still has room for improvement but that he
is not as withdrawn as he was in the beginning.  Based on his review of the
case file and his interactions and observations of the children during the
case, Flowers testified that he thinks termination of parental rights and
subsequent adoption is best for the children.  The parents did not make any
progress toward completing their services before being incarcerated, and
Flowers testified that their incarcerations present significant unknowns for
the future.  Further, Flowers testified that the parents had not shown an
ability to provide the children with stability and that he does not believe the
children would be harmed by not having future contact with their parents.

          Darlynn
Bruton

          Darlynn
Bruton testified that she is a licensed chemical dependency counselor and that she
became familiar with Mother through her participation in the H.O.P.E. In Jail
program.  Bruton testified that Mother successfully completed the program and
that she had progressed from a “fair” outlook at the beginning to a “very good”
outlook by the end of the program.  Bruton testified that, in her opinion,
Mother had overcome her “denial mechanism” concerning her drug use, had gained
insight into what her drug addiction had done to her, and had started to see
how her drug use affected her in the long term.  She and Mother spent time
discussing relapse prevention and developing a plan for regular meeting
attendance to avoid future drug use.  Bruton testified that Mother recognized
the need to take action on her own but to also rely on B.W. and “healthy”
friends in the future.  Mother had progressed to the point that she began
serving as a peer mentor to others in the program.  She also testified that she
believed the possibility of losing her children was one of Mother’s primary
motivations for succeeding in the program, that Mother will need additional
time in the real world to relearn her behaviors and avoid future drug use, and that
she has the tools and motivation to succeed.

          B.W.

          B.W.
is Mother’s grandfather.  He testified that he had seen a very positive change
in Mother since she started the H.O.P.E. In Jail program; he noticed a distinct
difference in her ability to communicate and to have meaningful conversations.

          B.W.
testified that he has a very good relationship with the children.  He agreed
that the Department had initially discussed placing the children with him and
that he had expressed reservation because he is almost eighty years’ old.
However, B.W. denied telling the Department that he definitely would not take
care of the children and said that it would be possible for him and his wife to
care for the children in their home.  He continued with some of the weekly visitations
with the children, even after Mother and Father were incarcerated, and he had
also attended each visit with Mother before her incarceration.  Because he
believed he and other family members were available to care for the children,
B.W. testified that he did not believe termination of Mother’s and Father’s
parental rights was in the children’s best interest.

B. 
Trial Court’s Judgment

          After
the trial, the trial court signed a judgment terminating Mother’s and Father’s
parental rights to the children.  The trial court found that termination of
Mother’s and Father’s parental rights to the children was in the children’s
best interest, that Mother and Father had knowingly placed or knowingly allowed
the children to remain in conditions or surroundings which endangered their
physical or emotional well-being, and that Mother and Father had engaged in
conduct or knowingly placed the children with persons who engaged in conduct
which endangered their physical or emotional well-being.  The trial court additionally
found that Father had knowingly engaged in criminal conduct that had resulted
in his conviction for an offense, confinement or imprisonment, and inability to
care for the children for not less than two years from the date of filing the
petition.  This appeal followed.

III. 
Standard of Review[6]

A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the
State seeks not just to limit parental rights but to erase them permanently—to
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  Tex.
Fam. Code Ann. § 161.206(b) (West 2008); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and
strictly construe involuntary termination statutes in favor of the parent.  Holick,
685 S.W.2d at 20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort
Worth 2009, no pet.).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp.
2011); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625,
629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also id. § 161.206(a).  Evidence is clear and
convincing if it “will produce in the mind of the trier of fact a firm belief
or conviction as to the truth of the allegations sought to be established.”  Id.
§ 101.007 (West 2008).  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.  In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In
re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for
termination and modification).

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our
own.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that the parent violated subsections (D), (E), or (Q) of
section 161.001(1) and that the termination of the parent-child relationship
would be in the best interest of the child.  Tex. Fam. Code Ann.
§ 161.001; In re C.H., 89 S.W.3d at 28.  If, in light of the entire
record, the disputed evidence that a reasonable factfinder could not have
credited in favor of the finding is so significant that a factfinder could not
reasonably have formed a firm belief or conviction in the truth of its finding,
then the evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.

We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  In re
J.P.B., 180 S.W.3d at 573, 574.  And even when credibility issues appear in
the appellate record, we defer to the factfinder’s determinations as
long as they are not unreasonable.  Id. at 573.

IV. 
Endangerment

Father
argues in part of his first issue that there is insufficient evidence to
support the trial court’s endangerment findings, and he asserts in his second
issue that termination of his parental rights would violate his rights to due
process because the termination cannot be based solely on his temporary
incarceration. Mother has not challenged the trial court’s endangerment
findings. 

A. 
Applicable Law

          The
trial court determined that Father knowingly placed or knowingly allowed the
children to remain in conditions or surroundings which endangered their
physical or emotional well-being and engaged in conduct or knowingly placed the
children with persons who engaged in conduct that endangered their physical or
emotional well-being.  See Tex. Fam. Code Ann. § 161.001(1)(D), (E).
 Because the evidence pertaining to subsections 161.001(1)(D) and (E) is
interrelated, we conduct a consolidated review.  In re T.N.S., 230
S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); In re J.T.G.,
121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.).

          “Endanger”
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at
533; J.T.G., 121 S.W.3d at 125.  Under subsection (D), it is necessary
to examine evidence related to the environment of the children to determine if
the environment was the source of endangerment to the children’s physical or
emotional well-being.  J.T.G., 121 S.W.3d at 125.  Conduct of a parent
in the home can create an environment that endangers the physical and emotional
well-being of a child.  In re W.S., 899 S.W.2d 772, 776 (Tex. App.—Fort
Worth 1995, no writ).  For example, abusive or violent conduct by a parent or
other resident of a child’s home may produce an environment that endangers the
physical or emotional well-being of a child.  See id. at 776–77; Ziegler
v. Tarrant Cnty. Child Welfare Unit, 680 S.W.2d 674, 678 (Tex. App.—Fort
Worth 1984, writ ref’d n.r.e.).  Parental and caregiver illegal drug use and
drug-related criminal activity likewise supports the conclusion that the
children’s surroundings endanger their physical or emotional well-being.  See
In re S.D., 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

          Under
subsection (E), the relevant inquiry is whether evidence exists that the
endangerment of the children’s physical well-being was the direct result of the
parent’s conduct, including acts, omissions, or failures to act.  See J.T.G.,
121 S.W.3d at 125; see also Tex. Fam. Code Ann. § 161.001(1)(E).  Additionally,
termination under (E) must be based on more than a single act or omission; the
statute requires a voluntary, deliberate, and conscious course of conduct by
the parent.  J.T.G., 121 S.W.3d at 125; see Tex. Fam. Code Ann. §
161.001(1)(E).  It is not necessary, however, that the parent’s conduct be
directed at the children or that the children actually suffer injury.  Boyd,
727 S.W.2d at 533; J.T.G., 121 S.W.3d at 125.  The specific danger to
the children’s well-being may be inferred from parental misconduct standing
alone.  Boyd, 727 S.W.2d at 533; In re R.W., 129 S.W.3d 732, 738
(Tex. App.—Fort Worth 2004, pet. denied).

          Although
imprisonment alone does not constitute a continuing course of conduct that
endangers the physical or emotional well-being of a child, it is a factor that
we may properly consider on the issue of endangerment.  Boyd, 727 S.W.2d
at 533–34; In re M.R., 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007,
no pet.).  The State is not required to show that incarceration was a result of
a course of conduct endangering the child; it must show only that incarceration
was part of such a course of conduct.  Boyd, 727 S.W.2d at 533–34.  When
incarceration affects the parent’s ability to care for his child, to provide
safe living conditions, or to ensure her safety and well-being, then such
incarceration can be a part of a course of continuing conduct.  See M.R.,
243 S.W.3d at 819.  Even evidence of criminal conduct, convictions, and
imprisonment prior to the birth of a child will support a finding that a parent
engaged in a course of conduct that endangered the child’s well-being.  J.T.G.,
121 S.W.3d at 133.

B. 
Analysis

Father
asserts that there is no evidence he used drugs in front of the children and
that the initial notice of removal form listed only Mother’s drug use as the
immediate danger.  Father also argues that he never intended to abandon the
children before, during, or after his incarceration and contends that
termination of his parental rights would violate his right to due process
because his incarceration was only a temporary setback, not a permanent
abandonment.

While
there is no evidence that Father used drugs in the children’s presence, that he
physically abused the children, or that he intended to permanently abandon the
children, there is sufficient evidence to support the trial court’s subsection
(D) and (E) findings.  Mother told Gilley that others living in the Prelude
Drive house with her, Father, and the children had used marijuana; had kept
drug paraphernalia in the house; and had sold methamphetamines from the house. 
Mother also admitted to Gilley that she and Father had bad methamphetamine
habits.  See S.D., 980 S.W.2d at 763 (holding mother’s drug use and
drug-related criminal activity supported trial court’s endangerment finding). 
Moreover, Father was incarcerated at the time of the termination trial and had
also been incarcerated in September 2009 when the Department received the
initial negligent supervision referral.  Father also had pleaded guilty or nolo
contendere over an eleven-year period to assault, drug possession, theft (three
times), criminal mischief, and evading arrest or detention.  See M.R.,
243 S.W.3d at 819 (noting that Father had been incarcerated for twenty-six of
child’s thirty-six month life, that incarceration prevented Father from “funding
better living conditions and financially supporting” child, and that Father’s
“continued criminality had contributed to the dangerous environment in which
[the child] had lived”). 

In
addition, although some of it is conflicting, there is evidence that Father
physically abused Mother, sometimes in front of the children.  Father admitted
to throwing a brick at Mother on one occasion because she was trying to hit him
with her truck and to pouring gasoline on Mother’s truck during a separate
argument.  And Mother reported in March 2010 that Father had broken her nose
after a visitation.  See id. (holding that evidence of exposing a child
to domestic violence supported endangerment finding).  Thus, the trial court’s
findings under subsections (D) and (E) of section 161.001 are not based solely
on Father’s temporary incarceration but are supported by his history of drug
use, criminal activity, and domestic violence.  Applying the appropriate
standards of review, we hold that legally and factually sufficient evidence
supports the trial court’s findings under section 161.001(1)(D) and (E).[7] 
We therefore overrule the first part of Father’s first issue and all of his
second issue.

V. 
Best Interest

Father
argues in the remainder of his first issue and Mother argues in her second
issue that the evidence is insufficient to support the trial court’s finding
that termination of their parental rights is in the children’s best interest.

A. 
Applicable Law

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1) the child’s age and physical and mental
vulnerabilities;

(2) the frequency and nature of out-of-home
placements;

(3) the magnitude, frequency, and circumstances of the
harm to the child;

(4) whether the child has been the victim of repeated
harm after the initial report and intervention by the department or other
agency;

(5) whether the child is fearful of living in or returning
to the child’s home;

(6) the results of psychiatric, psychological, or
developmental evaluations of the child, the child’s parents, other family
members, or others who have access to the child’s home;

(7) whether there is a history of abusive or assaultive
conduct by the child’s family or others who have access to the child’s home;

(8) whether there is a history of substance abuse by
the child’s family or others who have access to the child’s home;

(9) whether the perpetrator of the harm to the child
is identified;

(10) the willingness and ability of the child’s family
to seek out, accept, and complete counseling services and to cooperate with and
facilitate an appropriate agency’s close supervision;

(11) the willingness and ability of the child’s family
to effect positive environmental and personal changes within a reasonable
period of time;

(12) whether the child’s family demonstrates adequate
parenting skills, including providing the child and other children under the
family’s care with:

(A) minimally adequate
health and nutritional care;

(B) care, nurturance, and
appropriate discipline consistent with the child’s physical and psychological
development;

(C) guidance and supervision
consistent with the child’s safety;

(D) a safe physical home
environment;

(E) protection from repeated
exposure to violence even though the violence may not be directed at the
child;  and

(F) an understanding of the
child’s needs and capabilities;  and

(13) whether an adequate social support system
consisting of an extended family and friends is available to the child.

Id. § 263.307(b);
R.R., 209 S.W.3d at 116. 

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child
now and in the future;

(C)     the emotional and physical danger to the child
now and in the future;

(D)     the parental abilities of the individuals
seeking custody; 

(E)     the programs available to assist these individuals
to promote the best interest of the child;

(F)     the plans for the child by these individuals
or by the agency seeking custody;

(G)     the stability of the home or proposed
placement;

(H)     the acts or omissions of the parent which may
indicate that the existing parent-child relationship is not a proper one; and

(I)      any excuse for the acts or omissions of the
parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

B. 
Analysis

Father
points to evidence that he voluntarily requested anger management classes, that
he and the children have a strong bond, that his interaction with the children
at visitations was always appropriate, that he sent the children a letter from
jail, and that witnesses had reported that Father was a very loving, attentive
father at all times.  Father also notes that there was no testimony that he was
physically abusive toward the children at any time and that his sentence was
set to expire within two months of the termination trial.  There is also
evidence that the children asked for Father after visitations with Mother. 
Mother argues that termination is not in the children’s best interest because
she and the children have a strong bond, she interacted appropriately with the
children in all visitations, she missed only one visitation before her incarceration,
the Department planned to close the case after the initial September 2009
referral but for the December domestic violence allegation, she completed the
H.O.P.E. In Jail program, and the Department did not yet have any adoptive
family lined up for the children.

While there is evidence favorable to Mother and
Father, there is also evidence supporting the trial court’s determination that
termination of Mother’s and Father’s parental rights is in the children’s best
interest.  At the time of removal in February 2010, C.L.W. was two, and A.C.H.
was three; they each had lice and needed dental work because of visible tooth
decay.  The children also had splotchy coloring on their skin and seemed to
need more nutritional foods. The children showed “very big improvement” after
taking vitamins and eating healthier foods.  Also, neither child asked for
their parents or B.W. after the parental visitations stopped, and both improved
once the visitations stopped.  C.L.W.’s speech and occupational development seemed
appropriate for his age, but he sought negative attention.  A.C.H. was behind
developmentally, had shown signs of depression, and was attending occupational
therapy and speech therapy.  A.C.H. improved over time, but his ability to
articulate is still poor.  A.C.H.’s social skills improved most after
visitations with his parents stopped.  See In re J.L.B., 349 S.W.3d 836,
849 (Tex. App.—Texarkana 2011, no pet.) (holding sufficient evidence supported
best interest finding because the children’s emotional and physical needs
“would be better served by being with parents more like the foster mother”;
because the children had tooth deterioration, required speech therapy,
exhibited social and emotional developmental delay; and because of parents’
continued drug use).

There is also evidence of multiple domestic violence
incidents between Mother and Father, sometimes with the children present.  Father
admitted throwing a brick at Mother and said the brick hit Mother in her side,
and he claimed to have done so because Mother was trying to run into him with
her truck.  Father also admitted pouring gasoline on Mother’s truck during a
later argument, and Mother reported in March 2010 that Father had broken her
nose. There is conflicting evidence concerning the December 2009 incident, but
a witness called the police after seeing an altercation between Mother and
Father in the street and noticing that both children were present.  Mother and
Father also have a history of marijuana and methamphetamine use.  Mother
admitted continued drug use after the children’s removal.  There is also
evidence that methamphetamine was sold from the Prelude Drive house while the
children lived there.  See M.R., 243 S.W.3d at 820 (holding sufficient
evidence supported best interest finding because, among other things, children
had been exposed to domestic violence and drug abuse).

Mother
and Father initially expressed eagerness to work their services and regain
possession of their children, but Mother and Father had not submitted to drug
assessments or worked any of their services by May 2010.  Father did submit to
a drug assessment in May 2010, but he was incarcerated shortly thereafter. 
Collins acknowledged that parents often take six months to start working their
services, but she did not comment on whether those parents successfully defend
suits to terminate their parental rights.  See In re Y.G., No.
07-11-00349-CV, 2012 WL 652466, at *6–7 (Tex. App.—Amarillo Feb. 29, 2012, no
pet.) (mem. op.) (holding sufficient evidence supported best interest
determination because, among other things, the father had not completed any of
his services and had continued using drugs after the children’s removal). 

Mother successfully completed the H.O.P.E. In Jail
program after being ordered into the program, and she enjoyed the program and
served as a peer mentor.  Bruton testified that she and Mother had discussed
relapse prevention and a plan for regular meeting attendance to avoid future
drug use.  Despite Mother’s completion of the in-jail drug program, Jones
testified that termination of Mother’s and Father’s parental rights is in the
children’s best interest because the children need stability and a forever home
and because Mother and Father cannot provide that for the children.  Jones also
testified that Mother’s release from incarceration during the trial did not
affect her opinion because Mother still had “a ways to go” with the services
she did not work before going to jail.  See In re T.T.F., 331 S.W.3d
461, 488 (Tex. App.—Fort Worth 2010, no pet.) (addressing best interest and
stating that “[t]he evidence of [the mother]’s improved parenting skills and
stability must be balanced against the relative brevity of her stability in
light of her age”).

Several witnesses expressed their opinions that Mother
and Father have good relationships with the children.  Overstreet testified
that she believed Father was a “really good dad,” that he was “always very
attentive to the kids,” and that he “just seemed like any other dad with his
children.”  Overstreet similarly testified that Mother is a good and loving
mom, and the foster mother testified that Mother attended the doctor’s
appointment and seemed appropriately concerned for C.L.W. when C.L.W. had tubes
placed in his ears.  But Overstreet acknowledged that good parents do not use
methamphetamines, engage in domestic violence in front of their children, or
commit criminal acts that result in incarceration.

Also, Mother and Father have not provided a stable
home for the children.  Father was incarcerated at the time of the initial
referral for violating his probation, and he had pleaded guilty or nolo
contendere over an eleven-year period to seven different criminal offenses. 
Mother did not yet have a criminal record in September 2009, but she was
charged with possession of a controlled substance in April 2010 and placed on
probation, and she had a pending indictment for allegedly falsifying a
government document at the time of the termination trial.  In re S.M.L.,
171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (stating
that the father’s incarceration and pattern of criminal and violent conduct made
it likely that he would face incarceration again in the future).

Gilley testified that none of the placement options proposed
by Mother were acceptable.  The foster mother testified that she does not
intend to adopt the children but that they may remain in her home as long as
necessary for the Department to find an adoptive family.  She also testified
that she does not think finding an adoptive home will be difficult, that it is
in the children’s best interest to remain in a stable, structured environment,
and that she is concerned that the children would otherwise regress.

Applying
the appropriate standards of review and considering the applicable
best-interest factors listed above, we hold that legally and factually
sufficient evidence supports the trial court’s findings that termination of
Mother’s and Father’s parental rights is in the children’s best interest.  We
therefore overrule the remainder of Father’s first issue and all of Mother’s
second issue.

VI. 
Mother’s Remaining Issues

Mother
argues in her third issue that the trial court abused its discretion by denying
her oral motion for continuance and her written motion to extend the statutory
dismissal date.  She argues in her first issue that the trial court violated
her due process rights by failing to release her from a bench warrant.

A. 
Denial of Mother’s Motions for Continuance and for Extension of Statutory
Dismissal Date

 

In
her third issue, Mother complains about the trial court’s denial of her oral
motion for continuance and her written motion for an extension of the statutory
dismissal date.

1. 
Oral Motion for Continuance

A
motion for continuance shall not be granted except for sufficient cause
supported by an affidavit, through consent of the parties, or by operation of
law. Tex. R. Civ. P. 251; see In re E.L.T., 93 S.W.3d 372, 374 (Tex. App.—Houston
[14th Dist.] 2002, no pet.).  Here, Mother’s counsel made an oral motion for
continuance just before the termination trial began on January 10, 2011.
However, the record does not contain a written motion for continuance or an
affidavit.  If a motion for continuance is not made in writing and verified, it
will be presumed that the trial court did not abuse its discretion by denying
the motion.  See Villegas v. Carter, 711 S.W.2d 624, 626 (Tex. 1986);
E.L.T., 93 S.W.3d at 375.  Because Mother did not comply with rule 251, the
trial court did not abuse its discretion by denying her oral motion for
continuance.[8]  See Villegas, 711
S.W.2d at 626; see also In re T.H., No. 02-07-00464-CV, 2008 WL 4831374,
at *8 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.); In re T.D.N.,
No. 14-07-00387-CV, 2008 WL 2574055, at *1 (Tex. App.—Houston [14th Dist.] June
26, 2008, no pet.) (mem. op.) (holding trial court did not abuse its discretion
by denying oral motion for continuance because appellant did not comply with
rule of civil procedure 251).  Accordingly, we overrule this portion of
Mother’s third issue.

2. 
Motion to Extend Statutory Dismissal Date

A
trial court must dismiss a suit affecting the parent-child relationship if it
has not rendered a final order or granted an extension on the first Monday
after the first anniversary of the date the court rendered a temporary order
appointing the Department as temporary managing conservator.  Tex. Fam. Code
Ann. § 263.401(a) (West 2008).  The trial court may grant an extension of
up to 180 days if it finds that “extraordinary circumstances necessitate the
child remaining in the temporary managing conservatorship of the department and
that continuing the appointment of the department as temporary managing
conservator is in the best interest of the child.”  Id. § 263.401(b).  Because
an extension of the dismissal date is similar to a continuance and section
263.401(b) does not specify which appellate standard of review should apply, we
apply the abuse of discretion standard.  T.T.F., 331 S.W.3d at 476.

Here,
Mother’s counsel “reurged” Mother’s motion to extend the statutory dismissal
date on the first morning of trial.[9]  Mother argued that she
was scheduled to be released from jail the next day, that she had appointments
for life skills classes and a psychological assessment within a week, and that
she had successfully completed the services provided to her in jail.  The
Department opposed Mother’s motion because of Mother’s pending criminal case in
Tarrant County, arguing that the criminal charge could result in additional
incarceration. The children’s attorney ad litem also opposed the extension,
arguing that the conduct that resulted in Mother’s incarceration occurred after
the children were removed by the Department and that Mother did not take
advantage of the services offered to her before her incarceration.  The trial
court denied the motion.  Particularly given Mother’s failure to work the
services offered to her before her incarceration, we cannot say that the trial
court abused its discretion by denying an extension of the statutory dismissal
date so that Mother could have more time to complete her services.  See Shaw
v. Tex. Dep’t of Family & Protective Servs., No. 03-05-00682-CV, 2006
WL 2504460, at *8 (Tex. App.—Austin Aug. 31, 2006, pet. denied) (mem. op.)
(holding mother did not show that needing more time after failing to make
progress on the service plan for eight months amounted to extraordinary
circumstances).  We therefore overrule the remainder of Mother’s third issue.

B. 
Bench Warrant

Mother
argues in her first issue that the trial court “denied [her] due process rights
by failing to release [her] from the bench warrant[,] preventing Mother’s
release from Tarrant County Jail.”  The record reflects that the trial court
granted Mother’s request for a bench warrant so that Mother could be brought
from Johnson County to Tarrant County to attend trial beginning January 10,
2011, that Mother was scheduled to be released from Johnson County at midnight
January 10, 2011, but that Mother was still in the custody of Tarrant County
(but present at trial) on the morning of January 12, 2011.[10] 
In that regard, two portions of the record are relevant to Mother’s first
issue.  First, the following exchange occurred between Mother’s counsel and the
trial court before trial resumed on the morning of January 12:

THE COURT:  I think,
first of all, that we have [Mother’s counsel] who wishes to make a comment to
the court or a statement.

 

[Mother’s counsel]:  Just
for the record, my client appears here today.  She’s still in the custody of
the Tarrant County jail and she was transported over by the Tarrant County
Sheriff’s department.  She was on a bench warrant out of Johnson County to
Tarrant County.  Her sentence and her terms for Johnson County ended at
midnight on January 10th, and she was not released.  I did speak with the
Johnson County Sheriff’s Department and they had indicated that they had sent
the order to release her, and when I spoke with the Tarrant County Sheriff’s
Department, they had indicated that she was being held based upon the bench warrant
out of this court, and I know that we spoke off the record and I just wanted to
clarify that she shouldn’t be incarcerated today and I’m not sure why she is
appearing here today.  It seems to me now that she’s served a second day in
jail in Tarrant County without cause and without justification, and I’d like to
make sure that’s on the record and the Court can make clarifications about
that.

 

THE COURT:  All I can
say is that I wanted to insure that rather than being in jail in Johnson
County, she was available, your client was available, to you, and I made it
very clear if Johnson County released her, she was released, and I don’t know really
what happened with the jail, but that was — I did have her benched over here to
be available to you for this trial, but I made it clear to my staff that, you
know, Johnson County has authority in terms of her incarceration, not me.  I
just wanted her here for this trial.

Second,
the following exchange occurred just before the lunch recess on January 12:

 

THE COURT:  [Mother’s
Counsel], I’ve done a little research about what we can do about releasing your
client from incarceration, and I can send her right now to be released.  She’ll
go to Johnson County and probably not be able to be here for the rest of this hearing
today.  It’s your option.  I’m more than willing to release her to be
transported downtown to then be transported to Johnson County, but I’m
reconvening at two o’clock.  I have to attend a meeting downtown right now, so
I’m going to have to recess for pretty much an hour, but I’ll reconvene at two
o’clock, so I need to know right now if you want me to have her transported or if
you’d like her to remain here.

[Mother’s Counsel]:  If
I could have three minutes with my client, obviously, if we could have done it yesterday,
it would —

 

THE COURT:  All
right.

 

(Off-the-record
discussion here.)

 

[Mother’s Counsel]:  Your
Honor, do we have the rest of the afternoon from two to five today, or is there
another setting?

 

THE COURT:  That’s my
plan, yes.  I think that’s my plan.

 

(Off-the-record
discussion here.)

 

[Mother’s Counsel]: 
My client said that she’d like to be transported for release.  On the record,
my client has indicated that she does want to be released in accordance with
her original release date, so she’ll be transported down to the Tarrant County
jail to begin that process, is that correct?

 

THE COURT:  That’s
correct.  And you understand that we’d have to proceed without her this afternoon?

 

[Mother’s Counsel]:  I
understand that, Your Honor.  I know that the State has a couple more witnesses
and there are some other witnesses, so it’s my hope she’ll be returning before
the completion of the trial.

 

[Department’s
Counsel]:  I’d just like it to be clear, then, would it be [Mother’s Counsel]’s
intent then to ask for a continuance in the event that her client doesn’t appear
and we’re at a point where she had no other witnesses?

 

[Mother’s Counsel]:  No,
Your Honor.  We would waive that, and we would not be asking for a continuance in
the event she doesn’t return before the completion of the trial.

 

THE COURT:  All
right.  I’ll release her for transfer, and we'll reconvene at two o’clock.

This
and other courts review trial court rulings on issues relating to bench warrants
for an abuse of discretion.  In re Z.L.T., 124 S.W.3d 163, 165 (Tex.
2003); In re D.D.J., 136 S.W.3d 305, 311–14 (Tex. App.—Fort Worth 2004,
no pet.).  To determine whether a trial court abused its discretion, we must
decide whether the trial court acted without reference to any guiding rules or
principles; in other words, we must decide whether the act was arbitrary or
unreasonable.  Low v. Henry, 221 S.W.3d 609, 614 (Tex. 2007);
Cire v. Cummings, 134 S.W.3d 835, 838–39 (Tex. 2004).  An appellate court
cannot conclude that a trial court abused its discretion merely because the
appellate court would have ruled differently in the same circumstances.  E.I.
du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995); see
also Low, 221 S.W.3d at 620.

Mother
argues that “[s]eemingly, the Court required [Mother] to choose her freedom,
although wrongly restrained, or her presence at her trial on the termination of
her parental rights.”  To the extent Mother contends the trial court should
have continued the case until she could return from Johnson County after her
release from incarceration, the trial court did not abuse its discretion
because Mother expressly waived any continuance based on her absence. 
Otherwise, Mother does not specify in her appellate brief what she contends the
trial court should have done differently under these circumstances.  Thus,
Mother has not shown that the trial court abused its discretion, and we
overrule her first issue.

VII. 
Conclusion

Having
overruled each of Father’s and Mother’s issues, we affirm the trial court’s
judgment.

 

ANNE GARDNER
JUSTICE

 

PANEL: 
GARDNER,
MCCOY, and GABRIEL, JJ.

 

DELIVERED:  April 19, 2012









[1]See Tex. R. App. P. 47.4.





[2]Gilley wrote on the notice
of removal form that removal was based on Mother’s admission of methamphetamine
use; Gilley did not note any domestic violence allegations on the form.





[3]Mother was also indicted
in Tarrant County in July 2010 for an alleged November 2007 felony of making a
false statement in a government record.  The indictment alleged that Mother
fraudulently stated in an application for government assistance that no one in
her home had worked during the previous three months.





[4]Gaut testified that one
condition of Mother’s probation was having no contact with Father.  However,
Mother and Father had sent letters to one another but had addressed them to
B.W.  B.W. had forwarded the letters for them.





[5]Mother reported as late as
March 2010 that Father had broken her nose on the day of one of her visits with
the children.





[6]Neither Father nor Mother
clarify whether they challenge the legal or factual sufficiency of the
evidence, and they each have language in their briefs that arguably challenges
the sufficiency of the evidence on both grounds.  Thus, we review both the
legal and factual sufficiency of the evidence to support the trial court’s
findings.





[7]Along with a best interest
finding, a finding of only one ground alleged under section 161.001(1) is
sufficient to support a judgment of termination.  In re E.M.N., 221
S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).  Thus, we need not
address the trial court’s section 161.001(q) finding.  See id.; see
also Tex. R. App. P. 47.1, 47.4.





[8]Moreover, Mother based her
oral motion for continuance on the absence of her H.O.P.E. In Jail counselor. 
We note, however, that Mother’s counselor testified during the second day of
the trial.





[9]Nothing in the appellate
record shows that the motion for extension had previously been presented to and
ruled on by the trial court.





[10]There was apparently a
recess in the trial from the end of the day on January 10 until the morning of
January 12.  The reporter’s record does not contain any proceedings from
January 11.